UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAUN FAULEY, individually and on behalf of a class of similarly-situated persons, | ) ) ) |
| Plaintiff, | ) No. 1:15-cv-10735 ) |
| v. | ) Hon. Virginia M. Kendall ) |
| DRUG DEPOT, INC. a/k/a APS PHARMACY and JOHN DOES 1-10, | ) Magistrate Judge Mary Rowland ) ) |
| Defendants. | ) |

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Plaintiff, Shaun Fauley, by its attorneys, submits this Memorandum of Law in Support of his Motion for Class Certification.

**Introduction**

From February 2012, to April 2015, Drug Depot, Inc., a/k/a APS Pharmacy ("Defendant" or "APS") successfully sent 78,536 facsimile advertisements in 23 separate broadcasts, using "fax broadcaster" ProFax Inc. Of the 23 broadcasts, Plaintiff has obtained fax-transmission logs for transmissions on September 30, 2013 broadcast, showing 5,985 faxes were successfully transmitted, and July 22, 2013, showing 676 successful transmissions. For the remaining 21 broadcasts, ProFax sent APS fax logs after each broadcast, but APS claims not to possess them. However, ProFax bills only for successful transmissions, and Profax invoices demonstrate 71,875 faxes were successfully transmitted in the remaining 21 fax broadcasts. Plaintiff alleges these faxes are "unsolicited advertisements" in violation of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227(b)(1)(C), and seeks to certify the following classes:

1

<u>**Class A**</u>

All persons or entities who were successfully sent a Fax stating, "APS Pharmacy," and containing the phrase "Fax Order To: (727) 785-2502," on July 22, 2013, and on September 30, 2013.

<u>**Class B**</u>

All persons or entities who were successfully sent a Fax stating, "APS Pharmacy," and containing the phrase "Fax Order To: (727) 785-2502," on February 27, 2012, March 7, 2012, March 30, 2012, June 4, 2012, August 20, 2012, January 25, 2013, February 11, 2013, February 18, 2013, February 28, 2013, March 25, 2013, March 26, 2013, March 27, 2013, March 28, 2013, March 29, 2013, May 14, 2013, June 24, 2013, July 1, 2013, July 22, 2013, August 5, 2013, September 30, 2013, March 18, 2014, August 8, 2014, April 27, 2015.

"Class certification is normal" in TCPA cases "because the main questions, such as whether a given fax is an advertisement, are common to all recipients." *Holtzman v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013). This case is no exception. As argued below, the requirements of Rule 23(a) and 23(b)(3) are easily satisfied here, and Plaintiff requests that the Court certify the classes, appoint Plaintiff class representative, and appoint Plaintiff's counsel as class counsel.

<u>**Factual Background**</u>[1]

**A.     Defendants retain fax broadcaster ProFax to promote their pharmaceuticals.**

Defendant APS is a pharmacy that compounds pharmaceuticals for humans and pets, owned by Jamie Rios ("Rios") and Michelle LaGamba. (Rios Dep. at 5, 6, 16; Johnson Dep. at 10; LaGamba Dep. at 8). Rios works full time for APS and is its President. (Rios Dep. at 6, 8). William LaGamba ("LaGamba") has been employed as a manager at APS since 2007. (LaGamba Dep. at

---

[1] The attached Appendix of Exhibits contains the following: the Fax, <u>Exhibit 1</u>; Expert Report of Robert Biggerstaff ("Biggerstaff Report"), (Sept. 30, 2013 fax transmission logs to be filed under seal), <u>Exhibit 2</u>; Deposition of Andrew Barnett (Sept. 20, 2016) ("Barnett Dep."), <u>Exhibit 3</u>; Deposition of Jamie Rios (Nov. 16, 2016) ("Rios Dep."), <u>Exhibit 4</u>; Deposition of Eli Johnson ("Johnson Dep.") (w/APS218) (redacted), <u>Exhibit 5</u>; Deposition of William LaGamba ("LaGamba Dep."), <u>Exhibit 6</u>; Declaration of Shaun Fauley ("Fauley Decl."), <u>Exhibit 7</u>; Rule 30(b)(6) Deposition of APS ("Rios II Dep."), <u>Exhibit 8</u>; Firm Resume of Anderson + Wanca, <u>Exhibit 9</u>; Second Deposition of Andrew Barnett ("Barnett II Dep."), <u>Exhibit 10</u>.

2

6). Eli Johnson ("Johnson") has managed APS's marketing department since May 2011. (*Id.* at 6–7, Rios Dep. at 9, 11; Johnson Dep. at 5, 6).

Andrew Barnett ("Barnett") has been Vice President of ProFax for over 15 years. (Barnett Dep. at 6). ProFax disseminates information, including by fax. (*Id.* at 7). APS had an account with ProFax. (*Id.* at 10; Rios Dep. at 10; Johnson Dep. at 22). When APS ordered a fax broadcast, it supplied ProFax with a fax list and an image to be faxed. (*Id.* at 17). ProFax never changed, altered, or modified the fax lists or images provided by APS, nor was ProFax ever instructed by anyone at APS to seek permission to send fax advertisements. (*Id.* at 18, 21–22). Johnson did not personally call anyone asking for permission to send fax advertisements. (Johnson Dep. at 36). Johnson communicated with ProFax regarding the fax images and the fax list to which the image was sent; he sent the fax lists to ProFax. (Rios Dep. at 12, 13). Rios, among others, had a role in obtaining the fax numbers to which the faxes were sent. (*Id.* at 12, 13).

The Fax was designed by Johnson, with the prices listed being provided by Rios. (Rios Dep. at 17, 18). The Fax is something that would typically be sent out using ProFax. (Johnson Dep. at 26, 27). Johnson determined the fax numbers to which the Fax would be sent. (Rios Dep. at 19, 20; Rios II Dep. at 13). Johnson testified that Rios provided him the list of target fax numbers, either by email or via the APS server. (Johnson Dep. at 27, 28). The pharmaceuticals listed on the Fax were designed for cats, dogs, horses, and exotic pets. (Rios Dep. at 19). The Fax contains an opt-out notice stating, "To opt out from future faxes go to www.removemynumber.com and enter PIN# 0712, or call 877-286-5812. The recipient may make a request to the sender not to send any future faxes and that failure to comply with the request within 30 days is unlawful." (Ex. 1)

3

When ProFax completes a fax broadcast for a client, the ProFax system automatically generates and sends two separate emails: an invoice ("ProFax Invoice") and a fax report ("fax transmission logs"). (Barnett Dep. at 24). The ProFax Invoices regarding the faxes at issue in this motion are attached as Ex. 2 to Barnett's deposition transcript. (Barnett Dep. at 9, 10; *id*. at Ex. 2). The ProFax Invoices state when a fax broadcast starts ("released"), when it ends ("closed"), the target fax numbers provided to ProFax ("destinations"), whether the transmission is successful ("sent"), and whether it failed ("fail"). (*Id.* at 10, 11; *id*. at Ex. 2). ProFax charges customers only for successfully transmitted faxes. (*Id.* at 12). APS paid for the fax broadcasting services provided by ProFax with a credit card. (*Id.* at 14, 15; *id*. at Ex. 3).

After a fax broadcast, ProFax generates a fax transmission log for the broadcast, which represents the final results of the fax broadcast. (*Id.* at 21, 22, 26). In other words, fax logs show which transmissions to specific numbers were successful, and which were not. Fax transmission logs typically contains the fax numbers to which the image was sent to, the date, the time, the duration, how many pages were delivered, and other information that was provided to ProFax. (*Id.* at 27). The report would contain, and ProFax software records, how many transmissions were successful and how many transmissions were unsuccessful. (*Id.* at 28).

Rios testified the fax numbers to which the Fax was sent "would have come from a collection of different sources." (Rios Dep. at 20). Rios is unaware of any evidence that Dr. Fauley purchased any product from APS prior to August 2014. (*Id.* at 23). LaGamba does not have a specific understanding as to when APS first obtained information as to Dr. Fauley, including his fax number. (LaGamba Dep. at 30, 38). Johnson testified he didn't know if APS had Fauley's fax number. (Johnson Dep. at 16). APS (via Rule 30(b)(6) witness Rios) does not recall any interaction

4

with Dr. Fauley at any trade show and is unable to tell when APS obtained Fauley's fax number. (Rios II Dep. at 34, 36).

ProFax sent fax transmission logs via email to APS after each of the 23 fax broadcasts reflected in Exhibit 2 to the Barnett deposition transcript. (Barnett Dep. at 21, 22). Rios similarly testified it was his understanding that following each fax broadcast, ProFax provided APS fax transmission logs (to Johnson he believed). (Rios Dep. at 31, 32). Johnson testified that following fax broadcasts, ProFax sent fax transmission logs showing which transmissions were successful and which transmissions failed. (Johnson Dep. at 38). Johnson further testified he didn't recall if he received a fax transmission log for every single broadcast, but that he did "generally" receive fax logs after the fax broadcasts. (*Id.* at 41). Johnson testified he no longer had the fax transmission logs as to the APS fax broadcasts by ProFax because his desktop computer "died" in January 2016, and APS's server was corrupted so that there was "no way to retrieve the e-mails." (*Id.* at 38). Johnson testified he threw out his desktop computer. (*Id.* 38, 39, 40).

Other than the September 30, 2013, fax transmission log produced by ProFax, *see* Barnett II Dep. at 5, 6, 7, 8, *id.* Ex. 5, ProFax has been unable to locate the remaining 22 fax transmission logs for the broadcasts reflected in the ProFax Invoices. (Barnett Dep. at 24). However, APS did produce a fax transmission log for the July 22, 2013 broadcast ("July 22 Fax Transmission Log"). (Johnson Dep. at 42; APS 218). The July 22 Fax Transmission Log shows that there were 676 successful transmissions of a fax. (*Id*; Biggerstaff Report at Ex. 2).

Rios (on behalf of APS) testified it was his understanding that the Fax attached to the Complaint is dated September 30, 2013, and that it was sent by ProFax on behalf of APS. (Rios II Dep. at 11). The targets of the September 30, 2013 Fax were veterinarian fax numbers because "that is the group that we used to market to ProFax, to put that information to ProFax." (*Id.* at 13).

As to the other 22 fax broadcasts, Rios testified that they would be "similar" to the Fax, "and it would have the opt-out language." (*Id*. at 43).

      **B.**      **APS successfully transmits 78,536 faxes**

Plaintiff's expert, Robert Biggerstaff ("Biggerstaff") is a certified computer-forensic examiner and a member of the International Society of Forensic Computer Examiners. (Biggerstaff Report ¶¶ 4, 5). Biggerstaff has extensive experience in analyzing computer records in TCPA claims. (*Id*. ¶ 6). Biggerstaff reviewed the following materials in generating his report in this case: (a) the Complaint and exhibit; (b) Text file "91530.csv" containing fax log data; and (c) 23 Profax invoices. (*Id*. ¶ 10).

As to text file "91530.csv," Biggerstaff found the contents and format of the records "consistent with fax logs produced by a computer-based fax broadcasting platform which contemporaneously and automatically records metadata including the outcome of the documented fax transmissions." (*Id*. ¶ 14). Biggerstaff further stated that each record indicated, among other things, the destination fax number, the date and time, the pages sent, and a result for each transmission. (*Id.*) Biggerstaff found the data "consistent with fax detail logs produced by Profax, based on my prior experience with data produced by Profax." (*Id*.) Biggerstaff concluded that "This fax log documented details of 7,226 fax transmissions dated 09/30/2013. My analysis found that 5,985 of those transmissions were recorded as fully received error-free transmissions of a 1-page and each was sent to a unique fax number. A list of those 5,985 fax numbers is attached a Exhibit 1 hereto." (*Id*. ¶ 15; *see also id*. ¶ 44). Biggerstaff found a fax transmission to "630-983-8667" (Plaintiff's fax number) at row 5,575 of the fax log, recorded at "9/30/2013 8:46 AM" showing the transmission was "fully received and error free." (*Id*. at ¶ 16). Biggerstaff examined the image attached as Exhibit A to the Complaint and found the header with the date "09:30 2013 08:43:50 EST," to be consistent with the fax log of the transmission to "630-983-8667." (*Id*. ¶ 17).

Biggerstaff next summarized the Profax Invoices in a Table attached as Exhibit 2 to his Expert Report. (*Id.* ¶ 18). Biggerstaff states that "[c]ombined, these 23 invoices document fax transmissions between the dates 2/27/2012 and 4/27/2015 (inclusive)," and that of those, "78,536 are documented as fully received error-free transmissions." (*Id.* ¶¶ 19, 45). Biggerstaff noted that Invoice # PF201391530 dated September 30, 2013, documents billing for 5,985 successful transmissions, "which is consistent with the fax log identified above." (*Id.* ¶ 20).

<u>Argument</u>

**I.     The TCPA and its opt-out requirement.**

The TCPA prohibits sending "unsolicited advertisements" by facsimile, unless certain exceptions are met. 47 U.S.C. § 227(b)(1)(C). The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* § 227(a)(5). The TCPA creates a private right of action for any person or entity that receives an advertisement in violation of the Act and provides for statutory damages in the amount of $500 for each violation as well as injunctive relief against future violations. *Id.* § 227(b)(3)(A)–(B). Additionally, the TCPA provides treble damages may be assessed if in the Court's discretion the defendant "willfully or knowingly" violated the act. *Id.* § 227(b)(3).

The Federal Communications Commission ("FCC") has authority to prescribe regulations to implement the TCPA. *Id.* § 227(b)(2); *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012). Those regulations require specific "opt-out" language on all fax advertisements advising recipients how to stop receiving such faxes, even where the sender claims the faxes are sent

7

pursuant to an established business relationship ("EBR") or with "prior express invitation or permission." *Id.* § 64.1200(a)(4)(iii) & (iv).[2]

The TCPA directs the FCC to "prescribe regulations to implement" the opt-out notice requirement. The corresponding FCC regulation states an opt-out notice must (1) be clear and conspicuous and on the first page of the advertisement; (2) state that the recipient may make a request to the sender not to send any future unsolicited advertisements and that failure to comply within 30 days is unlawful; (3) set forth the requirements for an opt-out request under 47 U.S.C. § 227(b)(2)(E);[3] (4) include a domestic contact telephone and facsimile number for the recipient, and a cost-free mechanism for a recipient to transmit a request; and (5) permit the recipient to make such a request at any time on any day of the week. 47 C.F.R. § 64.1200(a)(4)(iii). The Seventh Circuit holds that "[e]ven when the Act permits fax ads – as it does to persons who have consented to receive them, or to those who have established business relations with the sender – the fax must tell the recipient how to stop receiving future messages." *Turza*, 728 F.3d at 683 (citing 47 U.S.C. § 227(b)(1)(C)(iii), (2)(D)).

**II.    Standards for class certification in a TCPA fax case.**

As stated above, "class certification is normal" under the TCPA "because the main questions, such as whether a given fax is an advertisement, are common to all recipients." *Turza*, 728 F.3d at 683. This is "an archetypical example of a case in which the class action mechanism is superior to that of individual litigation of each claim." *Hazel's Cup & Saucer, LLC v. Around*

---

[2] 47 C.F.R. § 64.1200(a)(4)(iv) provides "[A] facsimile advertisement that is sent to a recipient that has provided prior express invitation or permission to the sender must include an opt-out notice that complies with the requirements in paragraph (a)(4)(iii) of this section."

[3] 47 U.S.C. § 227(b)(2)(E) states that a request not to send future unsolicited advertisements is binding only if (1) it identifies the telephone number or numbers of the telephone facsimile machine to which the request relates; (2) the request is made to the telephone or facsimile number of the sender; and (3) the person making the request has not "subsequent to such request" provided express invitation or permission to the sender.

*The Globe Travel, Inc.*, 86 Mass. App. Ct. 164, 166 (2014). Judges in this District have certified classes in dozens of TCPA fax cases.[4]

### A. The class definitions are "ascertainable."

In *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015), the Seventh Circuit held "ascertainability" is limited to "the class definition itself," specifically whether it is "defined clearly and based on objective criteria," and does *not* concern whether "it would be difficult to identify particular members of the class," refusing to require a "reliable and administratively feasible way to identify all who fall within the class definition." *Id.* (rejecting *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013)). The Seventh Circuit held class-member identification—for giving the "best notice practicable" and distributing any recovery—relates to "superiority" under Rule 23(b)(3), particularity the "manageability" aspect. *Id.* The Seventh Circuit held a class of "purchasers" of a product was "ascertainable" because it was (1) not "vague," (2) not based on subjective criteria "such as a person's state of mind," and (3) not a "fail-safe class." *Id.* at 660–61.

In this case, Plaintiff seeks to certify two classes of persons sent fax images that are the same or substantially similar to the Fax attached to the Complaint that was sent to Plaintiff. As in

---

[4] *E.g.*, *Holtzman v. Turza*, 2009 WL 3334909 (N.D. Ill. Oct. 14, 2009); *Chapman v. Wagener Equities, Inc.*, 2014 WL 540250 (N.D. Ill. Feb. 11, 2014); *Bridgeview Health Care Ctr., Ltd., v. Clark*, 2011 WL 4628744 (N.D. Ill. 2011); *CE Design, Ltd. v. Cy's Crabhouse N., Inc.*, 259 F.R.D. 135 (N.D. Ill. 2009); *Creative Montessori Learning Ctrs. v. Ashford Gear, LLC,* 2011 WL 3273078 (N.D. Ill. July 27, 2011), 662 F.3d 913 (7th Cir. 2011) (vacated and remanded), 2012 WL 3961307 (N.D. Ill. Sept. 10, 2012) (certifying class); *Physicians Healthsource v. A-S Medication Solutions, LLC*, 318 F.R.D. 712 (2016); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, 2009 WL 2581324 (N.D. Ill. Aug. 20, 2009); *Brodsky v. HumanaDental Ins. Co.*, 2016 WL 5476233 (N.D. Ill. Sept. 29, 2016); *G.M. Sign, Inc. v. Group C Commc'ns, Inc.*, 2010 WL 744262, (N.D. Ill., Feb. 25, 2010); *G.M. Sign, Inc. v. Franklin Bank*, 2008 WL 2410427, (N.D. Ill. Aug. 20, 2008); *Green v. Serv. Master on Location Servs. Corp.*, 2009 WL 1810769 (N.D. Ill. June 22, 2009); *Hinman v. M&M Rental Center, Inc.*, 545 F. Supp. 2d 802 (N.D. Ill. 2008); *Paldo Sign v. Topsail*, 2010 WL 4931001 (N.D. Ill. Nov. 29, 2010); *Reliable Money Order, Inc., v. McKnight Sales Co., Inc.*, 281 F.R.D. 327 (E.D. Wis. 2012); *Sadowski v. Med1 Online, LLC*, 2008 WL 2224892 (N.D. Ill. May 27, 2008); *Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.*, 679 F. Supp. 2d 894 (N.D. Ill. 2010); *The Savanna Group v. Truan*, 2013 WL 626981 (N.D. Ill. Feb. 20, 2013) and 2013 WL 66181 (N.D. Ill. Jan. 4, 2013).

*Mullins*, the class definitions are not "vague," but rather "identifies a particular group of individuals," who were "harmed in a particular way" during "a specific period." *Id.* The definition is not based on any person's subjective "state of mind," but by the objective criteria of whether the person was sent one or more Faxes. *Id.* And the definition does not propose a "fail-safe" class, since it does not entail any conclusions about the merits of the case. *Id.* The class definitions are therefore "ascertainable" under *Mullins*.

### B. The Rule 23(a) elements are satisfied.

#### 1. Numerosity.

Rule 23(a)(1) numerosity is satisfied where the class is so numerous that joinder of all members "impracticable," and "a class of forty is generally sufficient." *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002). Here, APS sent fax advertisements to thousands of fax numbers, and numerosity is easily satisfied.

#### 2. Commonality.

Rule 23(a)(2) commonality requires only a single common question of law or fact that is "apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). This case presents four common legal issues to be determined on a classwide basis: (1) whether the Faxes are "advertisements" as defined by 47 U.S.C. § 227(a)(5) and 47 C.F.R. § 64.1200(f)(1); (2) whether APS is a "sender" as defined by 47 C.F.R. § 64.1200(f)(10); (3) whether the faxes contain the opt-out notice required for a sender to assert "established business relationship" under § 64.1200(a)(4)(iii) or "prior express invitation or permission" under § 64.1200(a)(4)(iv); and (4) whether APS "willfully or knowingly" violated the TCPA, allowing the Court to increase statutory damages from the automatic $500 per violation to $1,500 per violation, along with the appropriate scope of injunctive relief.

10

The Court need not, and should not, decide these questions now. It need only determine whether the *answers* to these questions are "apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551. These questions can be answered classwide, and doing so will resolve the entire case, which is why "[c]lass certification is normal" in TCPA fax cases. *Turza*, 728 F.3d at 683.

### 3. Typicality.

Rule 23(a)(3) requires the plaintiff's claims to be "typical of the claims or defenses of the class." There must be "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Stampley v. Altom Transp., Inc.*, 2015 WL 5675095, at *5 (N.D. Ill. Sept. 24, 2015) (citing *Spano v. Boeing Co.*, 633 F.3d 574 (7th Cir. 2011)). A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (citing *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983).

Here, Plaintiff is a member of Class A and Class B, and his claims are typical of the other members. APS acted consistently toward each class, sending fax advertisements through fax broadcaster ProFax, and the claims are based on the same legal theory, *i.e.*, transmission of faxes in violation of the TCPA.

### 4. Adequacy of representation.

Rule 23(a)(4) requires that the class representative "fairly and adequately protect the interests of the class." Adequacy concerns the adequacy of the proposed class representative and adequacy of the plaintiff's counsel. *Stampley*, 2015 WL 5675095, at *5 (quoting *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993)). "Adequacy" is met when the representative's interests are not antagonistic to or in conflict with those of the class. *Uhl v. Thoroughbred Tech. & Telecom.*, 309 F.3d 978, 985 (7th Cir. 2002). "The burden of showing

11

interest is relatively modest." *Redmon v. Uncle Julio's of Illinois, Inc.*, 2008 WL 656075 at *4 (N.D. Ill. Mar. 7, 2008). The Seventh Circuit "has made clear that the bar for a named plaintiff's adequacy is not set high." *Stampley*, 2015 WL 5675095, at *5 (citing *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080 (7th Cir. 2013)).

Plaintiff in this case, Dr. Shaun Fauley, operates a veterinary practice, consistent with the types of targets for APS's products. (Fauley Decl. ¶ 8). Dr. Fauley understands his obligations and the nature of the claims in this case. (*Id.* ¶¶ 3, 4, 5, 12). Dr. Fauley has no conflicts with any class members, he has been involved in this litigation, and he is willing to do whatever is necessary to protect the interests of the absent class members. (*Id.* at ¶¶ 13, 14).

Plaintiff's counsel are qualified to act as class counsel. (*See* Firm Resume of Anderson + Wanca). Plaintiff's counsel have been appointed lead or co-lead counsel in many contested class actions, including many TCPA cases, and have recovered substantial monies for class members. Anderson + Wanca have been litigating TCPA claims since 2003 and have prosecuted dozens of such cases to successful resolution, including many class-wide settlements.[5] Anderson + Wanca will continue to commit adequate resources, both staffing and monetary, to ensure the both Classes are well represented.

To date in this case, Plaintiff's counsel successfully opposed Defendant's motion to dismiss for lack of Article III standing, *see Fauley v. Drug Depot, Inc.*, 204 F. Supp. 3d 1008 (N.D. Ill.

---

[5] *See, e.g., CE Design Ltd. v. Cy's Crabhouse N., Inc.*, 259 F.R.D. 135, 142 (N.D. Ill. 2009) (finding "plaintiff's counsel's experience in TCPA class action demonstrates that counsel is adequate"); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, 2009 WL 2581324, *6 (N.D. Ill. Aug. 20, 2009); *Targin*, 679 F. Supp. 2d at 894; *Hinman*, 545 F. Supp. 2d at 804; *Holtzman v. Turza*, 2009 WL 3334909 (N.D. Ill. Oct. 14, 2009); *G.M. Sign, Inc. v. Group C Commc'ns., Inc.*, 2010 WL 744262 (N.D. Ill. Feb. 25, 2010); *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*, 2014 WL 7366255, at *6 (S.D. Fla. Dec. 24, 2014) ("Anderson & Wanca is one of very few firms that specialize in TCPA class actions and so is knowledgeable of the applicable law and experienced in litigating TCPA classes.").

2016), has deposed witnesses in New York (Barnett), Ohio (Rios (twice)), and Florida (LaGamba and Johnson), and has obtained from ProFax (through Subpoena) the ProFax Invoices and the September 30, 2013, fax transmission log. Plaintiff will continue to devote the time and resources necessary to represent Plaintiff and the putative classes in this case.

    C.    **The Rule 23(b)(3) requirements are satisfied.**

        1.    **Common questions predominate.**

"Predominance" requires that "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Stampley*, 2015 WL 5675095, at *6. Common questions "predominate" where "a common nucleus of operative fact and issues underlie the claims brought by the proposed class." *Id.*; *A-S Medication Solutions*, 318 F.R.D. at 724 (same). In this case, the four main questions are (1) whether the faxes are "advertisements," (2) whether APS is a "sender," (3) whether the faxes contain opt-out notice required to assert EBR or "prior express invitation or permission," and (4) the appropriate remedies, including whether statutory damages should be trebled and the scope of injunctive relief. The answers to these questions will not vary among class members, and predominance is met.

        2.    **Class certification is superior to the alternative.**

A class action is the "superior" method to adjudicate mass TCPA violations. *Hinman*, 545 F. Supp. 2d at 807 ("[R]esolution of the issues on a classwide basis, rather than in thousands of individual lawsuits (which in fact may never be brought because of their relatively small individual value), would be an efficient use of both judicial and party resources."); *Johansen v. GVN Michigan, Inc.*, 2015 WL 3823036, at *1 (N.D. Ill. June 18, 2015) (Posner, J.) (holding "argument that the TCPA can't be enforced by a class action is frivolous"). "Manageability" requires the court to consider "the likely difficulties in managing a class action," balanced against the "countervailing interests" in deciding whether a class action is superior. *Mullins*, 795 F.3d at 658. Manageability

13

is almost never a bar to class certification, since "a class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all." *Id.*; *id.* at 666–67 (holding courts "should not let the perfect become the enemy of the good," by "[r]elying on concerns about what are essentially claim administration issues to deny certification").

Even where it is totally "infeasible" to identify class members to give notice or pay their statutory damages, "[a] class action, like litigation in general, has a deterrent as well as a compensatory objective," and "[i]n a class action the reason for a remedy modeled on cy pres is to prevent the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds" of a settlement or judgment. *Hughes v. Kore of Ind. Enters., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013); *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014) (holding TCPA statutory damages "operate as bounties, increasing the incentives for private enforcement of law").

APS may argue Class B is not manageable because fax-transmission logs for 21 of 23 broadcasts are currently unavailable. But "[c]lass actions cannot be defeated by destroying records," and defendants "cannot avoid a class suit merely because their own actions have made the class more difficult to identify." *Appleton Elec. Co. v. Advance-United Expressways*, 494 F.2d 126, 135, 139 (7th Cir. 1974). In the TCPA context, courts have refused to allow a failure to maintain records to defeat class certification. *See CE Design v. Beaty Constr., Inc.*, 2009 WL 192481, at *1, *3 (N.D. Ill. Jan. 26, 2009) (certifying TCPA class where target list of fax numbers had been lost or destroyed, although there was no evidence list was destroyed with a "nefarious" purpose, since defendant cannot "escape liability simply by destroying the list of its victims"); *Sadowski v. Med 1 Online, LLC*, 2008 WL 2224892, at *3 (N.D. Ill. May 27, 2008) (holding it

14

"would be unfair to hold otherwise given that the missing list of recipients was last in Defendant's possession."); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014) (refusing to limit TCPA class based on defendants' recordkeeping, where it "would create an incentive for a person to violate the TCPA on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct"); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 570, n.6 (W.D. Wash. 2012) (holding "identifying class members and providing them with notice may be difficult" in TCPA case where call lists had been destroyed, but "it would be unfair to deny class certification because of the potential difficulty of identifying the class members where that difficulty is mostly due to the fact that [the defendant] destroyed the call lists that it used"); *see also Smith v. Greystone Alliance LLC*, 2010 WL 2680147, at *3 (N.D. Ill. June 30, 2010) (certifying debt-collection class action, holding class was "difficult to identify" only because defendant "does not adequately record or document its calls");

The only way to hold APS accountable, given the relatively low individual recoveries, is class enforcement. *See Chapman v. Wagener Equities, Inc.*, 2014 WL 540250 *16 (N.D. Ill. Feb. 11, 2014) ($500 statutory damages gives individual plaintiffs "a low incentive to bring a lawsuit on their own behalf"); *Mussat v. Global Healthcare Res., LLC*, 2013 WL 1087551, at *7 (N.D. Ill. Mar. 13, 2013) (TCPA class superior given "fairly small potential for individual recovery"); *Savanna Group v. Trynex, Inc.*, 2013 WL 66181, at *16 (N.D. Ill. Jan. 4, 2013) (same). Class certification is thus superior to the alternatives, "recogniz[ing] both the costs *and benefits* of the class device," despite Defendants' failure to maintain complete records. *Mullins*, 795 F.3d at 663.

## CONCLUSION

For the foregoing reasons, Plaintiff asks the Court certify Class A and Class B, appoint Plaintiff as class representative for both Classes, and appoint Plaintiff's counsel as class counsel.

15

Dated: July 7, 2017

Respectfully submitted,

Shaun Fauley, individually and as the representative of a class of similarly-situated persons

By: /s/ Ryan M. Kelly
Ryan M. Kelly

Brian J. Wanca
Ryan M. Kelly
Ross M. Good
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
Telephone: (847) 368-1500
Facsimile: (847) 368-1501

**CERTIFICATE OF SERVICE**

      I hereby certify that on July 7, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

                                                        /s/ Ryan M. Kelly